IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Domenic Callaway,

              Plaintiff,      Case No. 1:17-cv-03466

v.                                Michael L. Brown
                                United States District Judge

Andrew Chapman, in his
individual capacity,

              Defendant.

_____/

## ORDER

Defendant Officer Andrew Chapman seeks summary judgment on Plaintiff Domenic Callaway's claim against him for excessive force under 42 U.S.C. § 1983.  (Dkt. 47.)  The Court grants Defendant's motion.

## I.    Factual Background

On the afternoon of September 10, 2015, Defendant Officer Andrew Chapman, a police officer with Clayton County, Georgia, responded to a "Signal 6," code for a burglary in progress, at a residence in Clayton County.  (Dkts. 47-2 ¶ 1; 50-1 ¶ 1; 51-3 at 1:16–20.)  A burglary in progress is a "Priority 1" call, meaning it is the highest level emergency.

Officer Chapman testified that, based on his training and experience, burglaries in progress often include armed suspects. (Dkts. 47-2 ¶ 2; 50-1 ¶ 2.) He testified that officers responding to such calls generally approach with guns drawn to protect themselves. (Dkts. 47-2 ¶ 2; 50-1 ¶ 2.)

Dispatch advised over the radio that the 911 caller said two suspects had arrived at a home in a silver Toyota Camry, parked in front of the house, kicked in the front door, and entered. (Dkts. 47-2 ¶ 3; 50-1 ¶ 3.) Dispatch also advised of a possible "69," code for a weapon on the scene. (Dkts. 47-2 ¶ 4; 50-1 ¶ 4.) The dispatcher specifically said ". . . just be advised, unclear if 69 . . . the caller did see one put something into his waistband." (Dkts. 50-1 ¶ 4; 51-3 at 2:01–06.)

Officer Chapman parked his patrol vehicle a few houses away from the home being burgled. (Dkt. 51-4 at 9:10–12.) Believing that the suspects inside were possibly armed, he approached the side of the residence with his weapon drawn. (Dkts. 47-2 ¶ 5; 50-1 ¶ 5.) As he got near, he saw a black male, later identified as Plaintiff Domenic Callaway, run out the front door. (Dkts. 47-2 ¶ 6; 50-1 ¶ 6.)

According to Officer Chapman's testimony, Plaintiff was holding the front of his waistband as he ran from the house. (Dkts. 47-2 ¶ 7; 50-1 ¶ 7.) The record contains conflicting information about whether Plaintiff was, in fact, holding his waistband or whether he was pulling "[his] pants up when [he] took off running." (Dkt. 50-1 ¶ 7.) Officer Chapman claims the former; Plaintiff the latter. Plaintiff also points to Officer Chapman's testimony and recorded recitations of the incident, which contained no mention of Plaintiff holding his waistband as he ran from the house. (*Id.*; Dkt 50-2 ¶ 1.) But Plaintiff points to no evidence directly contradicting Chapman's testimony that Plaintiff held his waistband (i.e., the record contains no evidence that at any time Officer Chapman testified that Plaintiff was *not* holding his waistband). So, Plaintiff raises no genuine issue of fact on this issue. Whether he was holding a weapon of merely adjusting his waistband is also immaterial to the Court's qualified immunity determination given the totality of other circumstances. Officer Chapman testified, based on his training and experience, that suspects often keep weapons tucked under their waistbands. (Dkt. 47-2 ¶ 8.) After receiving the radio call about a possible weapon, Officer Chapman (and any reasonable officer in the

3

circumstances) would have interpreted Plaintiff's movement (along with his other actions) as further indicating the existence of a firearm.  (*Id.* ¶ 9; Dkt. 70 at 134:7–11.)

Officer Chapman then gave Plaintiff several verbal commands, including yelling "stop," "police," and "get on the ground."  (Dkts. 47-2 ¶ 10; 50-1 ¶ 10.)  Officer Chapman also warned Plaintiff that if he did not stop, he would shoot. (Dkts. 47-2 ¶ 10; 50-1 ¶ 10.)  Plaintiff ignored those commands and kept running toward the getaway car (which was still running).  (Dkts. 47-2 ¶ 11; 50-1 ¶ 11.)  Officer Chapman ran after Plaintiff, but Plaintiff got into the driver's seat of the car.  (Dkts. 47-2 ¶ 12; 50-1 ¶ 12.)  Officer Chapman continued to give loud verbal commands to Plaintiff to stop and get out of the car, all the while pointing his duty weapon at Plaintiff.  (Dkts. 47-2 ¶ 13; 50-1 ¶ 13.)  Plaintiff still refused to comply with Chapman's commands.  (Dkts. 47-2 ¶ 13; 50-1 ¶ 13.)

Instead, Plaintiff put the vehicle in drive, hit the gas,[1] ducked his head down even with the dashboard, and drove toward Officer Chapman,

---

[1] Plaintiff disputes whether he "punched the gas" but admits that he was driving fifteen to twenty miles per hour at the fastest, toward Chapman. (Dkts. 50-1 ¶ 14; 50-2 ¶ 23.)

4

who was standing in the grass on the side of the road. (Dkt. 47-2 ¶ 14; 50-1 ¶ 14.) Chapman claims that he "braced himself and pushed off the front of the vehicle with his left hand and left knee." (Dkt. 47-2 ¶ 14.) Plaintiff disputes whether he hit Officer Chapman with the vehicle or whether Chapman even made contact with the vehicle. (Dkt. 50-1 ¶ 14.)

Officer Chapman claims that he saw Plaintiff holding a black pistol while in the car. Officer Chapman says Plaintiff had the gun in his right hand on his lap but pointed it in the officer's direction.[2] (Dkt. 47-2 ¶ 14.) At that point, Officer Chapman fired his duty weapon twice in rapid succession, believing Plaintiff planned to run him over. (*Id.*; Dkt. 70 at 44:7–9.) Another deputy on the scene testified that he heard Officer Chapman yell "gun" in the split-second before Chapman fired. (Dkt. 47-2 ¶ 14.) Officer Chapman shot Plaintiff in his left forearm and lower

---

[2] Plaintiff disputes this fact, claiming that he did not in fact have a pistol in his lap. (Dkt. 50-1 ¶ 14; 50-2 ¶ 33.) Whether he had a weapon in his lap does not alter Officer Chapman's testimony of what he observed in those split-seconds. (Dkt. 58 ¶ 33.) "The only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009). The Court notes, however, that law enforcement officers later recovered a firearm from the vehicle. (Dkt. 50-1 ¶ 14.)

back.  (*Id.* ¶ 15; Dkt. 50-1 ¶ 15.)  Plaintiff stopped the car, and officers arrested him.  They provided medical care for his gunshot wounds.[3]

Plaintiff sued Officer Chapman under § 1983, claiming Chapman violated his Fourth Amendment rights by using excessive force and also asserting a claim for punitive damages and attorneys' fees.  Defendant Officer Chapman moves for summary judgment based on qualified immunity.  (Dkt. 47.)

## II.  Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it is "a legal

---

[3] The parties include various facts about events after the shooting, including criminal charges brought against Plaintiff related to the burglary, the investigation into Officer Chapman's use of force, and superfluous facts about Plaintiff's criminal history.  (Dkts. 47-2 ¶¶ 16–27; 50-1 ¶¶ 16–27.)  Such facts are immaterial to the Court's qualified immunity determination at summary judgment, however.

element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The party moving for summary judgment bears the initial burden of showing a court, by reference to materials in the record, that there is no genuine dispute as to any material fact that a jury should decide at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). A moving party meets this burden merely by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. The movant, however, need not negate the other party's claim. *Id.* at 323. In determining whether the moving party has met this burden, a court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the movant has adequately supported its motion, the nonmoving party then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a

genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, there is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. *Id.* But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. The court, however, resolves all reasonable doubts in the favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

### III. Analysis & Discussion

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (internal quotation marks omitted). So "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). It allows officials to "carry out their discretionary duties without the fear of personal liability or harassing

8

litigation." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). When properly applied, qualified immunity thus "protects all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743 (internal quotation marks omitted).

Qualified immunity may attach only when the officer is "acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Grider v. City of Auburn*, 618 F.3d 1240, 1254 n.19 (11th Cir. 2010). The parties agree Officer Chapman acted within the scope of his discretionary authority during the incident. (Dkt. 47-1 at 5 n.3.) Plaintiff thus has the burden of showing that qualified immunity is unavailable to him. *See Lee*, 284 F.3d at 1194.

The qualified immunity analysis presents two questions: first, whether the allegations, taken as true, establish the violation of a constitutional right; and second, if so, whether the constitutional right was clearly established when the violation occurred. *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). These distinct questions "do not have to be analyzed sequentially." *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011). Instead, a court may address them in either order, although a plaintiff's failure on either prong dooms his claim. *Id.*

9

On summary judgment, the burden thus lies with Plaintiff to show that Officer Chapman's actions violated the relevant constitutional right and that the right was clearly established at the time. *See Hadley*, 526 F.3d at 1329.

### A. Excessive Force Claim Against Defendant Officer Chapman

Plaintiff alleges excessive force under § 1983, arguing that Officer Chapman violated his Fourth Amendment rights by shooting him while he fled from an interrupted burglary. (Dkt. 1 ¶ 29.) Officer Chapman claims he is entitled to qualified immunity because the use of force was objectively reasonable. (Dkt. 47-1 at 8.) The Court agrees.

Chapman's actions in shooting Plaintiff at the time of his arrest constituted the use of deadly force. The Fourth Amendment requires that a seizure by the use of deadly force be objectively reasonable in the circumstances. *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985) (apprehension by use of deadly force is a seizure subject to Fourth Amendment's reasonableness requirement). This means an officer may only use deadly force during an arrest "to dispel a threat of serious physical harm to either the officer or others." *Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015); *Robinson v. Arrugueta*, 415 F.3d 1252,

10

1256 (11th Cir. 2005) (holding officer may use deadly force only against person officer perceives as posing imminent risk of serious physical harm to officer or others). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene" — an objective analysis. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). The Eleventh Circuit has stated that "reasonableness is dependent on all the circumstances that are relevant to the officer's decision to use deadly force, including the seriousness of the crime, whether the suspect poses an immediate danger to the officers or others, whether the suspect resisted or attempted to evade arrest, and the feasibility of providing a warning before employing deadly force." *Jean-Baptist v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010).

Importantly, a court "must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal." *Crosby v. Monroe City*, 394 F.3d 1328, 1334 (11th Cir. 2004). The court must recognize that these split-second decisions occur "in circumstances that are tense, uncertain, and rapidly evolving." *Graham,* 490 U.S. at 397. A court may not assess

11

the reasonableness of an officer's actions "with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 397; *see also Hadley*, 526 F.3d at 1330 ("[E]xcessive force is judged solely on an objective basis."). Finally, the Eleventh Circuit has held that an officer may use deadly force against a driver who is using a vehicle to threaten the officer's life. *Thomas v. Moody*, 653 F. App'x 667, 672 (11th Cir. 2016).

The parties dispute whether Plaintiff actually hit Officer Chapman with the vehicle. Chapman says he did. Plaintiff says he did not. For summary judgment, the Court accepts Plaintiff's evidence and assumes he did not strike the officer with his car. *See Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."). That assumption, however, does not preclude qualified immunity.

Officer Chapman testified that he believed Plaintiff was going to run him over. The undisputed evidence also shows Plaintiff repeatedly refused to obey Chapman's commands to stop, that he fled from the house into a running car to escape the police, and that he drove towards Chapman. Officer Chapman claims Plaintiff "hit the gas" and ducked his

12

head down while driving at him. Plaintiff denies "hitting the gas" but admits he may have been driving as fast as twenty miles per hour toward Chapman. (Dkts. 50-1 ¶ 14; 50-2 ¶ 23.) He also admits that he lowered his head even with the dashboard but says he did so because he was leaning into the passenger's seat. (*Id.*) Under these facts, a reasonable officer at the scene would have concluded that Plaintiff posed an imminent threat of serious injury to Chapman, thus supporting the use of deadly force. *See Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005) ("Even if in hindsight the facts show that [the officer] could have escaped unharmed . . . a reasonable officer could have perceived that [the suspect] was using [his car] as a deadly weapon," and thus the officer "had probable cause to believe that [the suspect] posed a threat of serious physical harm."); *see also McCullough v. Antolini*, 559 F.3d 1201, 1207 (11th Cir. 2009) (recognizing that the Eleventh Circuit has "consistently upheld an officer's use of force and granted qualified immunity in cases where the decedent used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force").

Plaintiff does not meaningfully respond to this argument, instead simply saying "no reasonable officer would believe that the vehicle was being used as a weapon against him." (Dkt. 50 at 13.) But the undisputed facts show otherwise.

The Eleventh Circuit has said officers in a rapidly developing and potentially dangerous situation need not wait until the very moment a suspect uses a deadly weapon (such as a vehicle) before using deadly force. *See Spencer v. City of Orlando*, 725 F. App'x 928, 932 (11th Cir. 2018) ("To be clear, the officers were not required to wait until [the suspect] successfully restarted the car and drove toward them before they defended themselves."); *Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002) (concluding at the summary judgment stage that officers did not use excessive force in shooting a suspect who had stopped his vehicle after a high-speed chase — even though the court accepted that, at the time of the shooting, the suspect had neither tried to run over nor aimed the vehicle at officers); *see also Long v. Slaton*, 508 F.3d 576, 579–81 (11th Cir. 2007) (finding that an officer's use of deadly force reasonable even when the suspect was backing a stolen police car *away* from the officer at time of the shooting). So, Officer Chapman was not required to let

14

Plaintiff run him over or alternatively determine Plaintiff was not going to hit him before responding with deadly force.

The record also contains no evidence that Officer Chapman applied the force maliciously or sadistically. *See Hadley*, 526 F.3d at 1329. And Plaintiff presents nothing to challenge the evidence that Officer Chapman acted in good faith, despite speculating in a brief that Officer Chapman "put a gun in [Plaintiff's] hand *post hoc* in order to avoid criminal prosecution." (Dkt. 50 at 14.) That speculation, without any evidence in the record, is insufficient to create a genuine dispute of material fact. Considering the totality of the circumstances, the Court holds that Officer Chapman's use of deadly force was objectively reasonable for an officer in his situation.

Officer Chapman's split-second decision to use deadly force was alternatively justified because he reasonably believed Plaintiff had a gun and was continuing to advance on him — that is, because Plaintiff posed a threat to his life — not just from the manner in which he drove the car — but also because he was brandishing a firearm. Plaintiff claims he did not have a weapon, and the Court accepts that fact when considering summary judgment. The determination of reasonableness, however,

15

"must be made from the perspective of the officer." *Troupe v. Sarasota Cty.*, 419 F.3d 1160, 1168 (11th Cir. 2005). The Eleventh Circuit has thus held that subsequent evidence a suspect was unarmed does not preclude qualified immunity if a reasonable officer in the circumstances would have believed the suspect was armed and posed a threat to the officer's safety. *See, e.g.*, *Wilson v. Miller*, 650 F. App'x 676, 680 (11th Cir. 2016) ("That we know now that [the suspect] in fact had no weapon cannot and does not change our conclusion. The reasonableness of force used is not judged with 20/20 vision of hindsight." (internal quotation marks omitted)).

A reasonable officer in Chapman's situation would have believed Plaintiff had a weapon and posed a threat to the officer. The circumstances began when Officer Chapman received the first radio call. The nature of the call was a burglary in progress, where there is a high likelihood of an armed suspect. The dispatch officer advised Chapman there was a possible weapon, saying the 911 caller reported seeing one of the suspects put something into his waistband. As Officer Chapman approached the residence, he saw Plaintiff run out of the house holding his waistband. Based on the information relayed to him by dispatch, his

training and experience, and his personal observations at the scene, Chapman reasonably believed Plaintiff had a weapon on him.

And right before shooting, Officer Chapman saw a gun in Plaintiff's lap. The other deputy on the scene, in fact, testified that he heard Officer Chapman yell "gun" in the split-seconds before firing. Officer Chapman also testified that when he fired his gun, he believed doing so was necessary to prevent death or great bodily injury to himself. Considering the totality of the circumstances, Officer Chapman's use of deadly force was objectively reasonable.

The Court understands police officers rarely have complete information while responding to tense and dangerous situations that require split-second decisions with potentially fatal consequences. So, this Court does not judge Officer Chapman's conduct from the comfort and safety of its chambers but rather from a reasonable assessment of the facts he faced at the time. *Crosby*, 394 F.3d at 1333–34. From this perspective, Plaintiff's arguments are unavailing. Plaintiff, for example, argues that "[t]he 'reasonable officer' isn't Mr. Magoo on an acid trip. He doesn't see guns that aren't there in broad daylight, and he doesn't mistake briefly pulling one's pants up for holding onto the handle of a

17

gun." (Dkt. 50 at 14 n.8.) But this "glib" argument incorporates not only hindsight but also *Plaintiff's* perception of events. Perhaps Plaintiff really was just hiking up his pants as he ran to get away, but Officer Chapman testified that Plaintiff held his waistband as if holding a gun. Officer Chapman's perspective is what matters. And perhaps Plaintiff did not have a gun in his lap as he drove toward Chapman, but it appeared to Officer Chapman that he did. Combined with the other evidence, Chapman had reason to believe Plaintiff was armed as he ignored Chapman's commands to stop and continued advancing on him.

The record presents no genuine issue of material fact about the interaction between Plaintiff and Officer Chapman. The totality of the circumstances supports the reasonableness of Officer Chapman's use of deadly force, from the perspective of a reasonable officer at the scene. The Court finds no constitutional violation and thus concludes that Officer Chapman is entitled to qualified immunity.[4] The Court grants

---

[4] Because the Court has determined that Defendant Chapman did not violate Plaintiff's constitutional rights, the Court need not decide whether the law was clearly established at the time of the incident. *See Wood v. Kesler*, 323 F.3d at 878 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001))).

his motion for summary judgment and dismisses Plaintiff's § 1983 claim for excessive force.

### B. Plaintiff's Claim for Punitive Damages and Attorneys' Fees

Plaintiff also seeks punitive damages and attorneys' fees. (Dkt. 1 ¶¶ 35, 36.) But because Plaintiff's underlying claim fails, Officer Chapman is entitled to summary judgment as to Plaintiff's claims for punitive damages and attorneys' fees as well. *OFS Fitel, LLC v. Epstein, Becker & Green, P.C.*, 549 F.3d 1344, 1357 (11th Cir. 2008).

The Court dismisses this claim for the additional reason that Plaintiff abandoned it by failing to address that part of Officer Chapman's motion. *See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (finding that a party's failure to brief and argue an issue before the district court is grounds for declaring it abandoned).

## IV. Conclusion

The Court **GRANTS** Defendant Officer Andrew Chapman's Motion for Summary Judgment (Dkt. 47) and **DISMISSES** this action.

**SO ORDERED** this 31st day of December, 2019.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE